THE RUNDLETT COMPANY *vs.* MARRINER S. MORRISON.

Cumberland.    Opinion November 7, 1921.

*Verdict for defendant unmistakably wrong and should not stand, upon defendant's own testimony, corroborating testimony of plaintiff's witnesses. The appointment of a receiver for plaintiff after action brought, and general issue filed by defendant, does not abate the action.*

If this case presented solely a question of credibility, of the weight to be given to the testimony, we might hesitate to interfere with the verdict, notwithstanding the number of witnesses stands three to one against it. But the version given by the defendant of his statements to Mr. Black, the cashier, and to Mr. Christian, the treasurer of the plaintiff, unmistakably carried the implication that the price of coal screenings had advanced. Any person would understand therefrom that the increase was in the price of the screenings, not in the price of hauling. The testimony of defendant thus corroborates the testimony of plaintiff's witnesses. It is clear that the verdict is wrong and should not stand.

The defendant's contention that he was dealing in screenings, selling them to The Rundlett Company, cannot be sustained. The coal was sold to The Rundlett Company upon its credit, charged to it, billed out to it, and the weigh slips read, "Sold to Rundlett Co."

The defendant's contract was to haul coal screenings for one dollar per ton; if he would maintain his right to the money under another and different contract, the assent of the plaintiff to such other contract must clearly appear.

Mere negligence in making a mistake is not sufficient to preclude the plaintiff who made it from demanding its correction; for such negligence should not warrant the defendant in retaining the benefits of the mistake, unless his circumstances have been thereby so changed as to render it unjust and prejudicial to his legal interests.

The action by the corporation did not abate upon the appointment of a receiver, but may be continued for the benefit of the latter, and his name should be substituted by an order obtained on summary application.

On motion for new trial by plaintiff.    An action of assumpsit to recover the sum of three hundred fifty dollars and seventy cents,

which plaintiff claims the defendant has in his possession, having obtained it by false and fraudulent representations, which in equity and good conscience belongs to him. Verdict was for defendant which the plaintiff moves to set aside for usual reasons. Motion sustained.

Case stated in the opinion.

*Bradley, Linnell & Jones,* for plaintiff.

*Jacob H. Berman, and Benjamin L. Berman,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

MORRILL, J. This is an action to recover $350.70, which the plaintiff claims was an overpayment for hauling coal screenings, obtained through the misrepresentation of defendant. The jury returned a verdict for defendant, which the plaintiff moves to set aside for the usual reasons. The motion must be sustained.

The plaintiff operated a cold storage plant on Union Wharf, Portland, where it used coal screenings purchased of Lehigh Coal and Navigation Company, which had a place of business on the same wharf. The plaintiff had another place of business on Commercial Wharf where its treasurer's office was located.

The following facts are not disputed: in the fall of 1919 the defendant made a contract with the plaintiff to haul screenings from the Lehigh sheds for one dollar per ton. The screenings were sold to the plaintiff for two dollars per ton. Every Saturday morning the defendant presented to one Black, plaintiff's cashier, the weigh slips of screenings hauled during the week and collected three dollars per ton; two dollars per ton he paid to the Lehigh Company and received a receipted bill, which so far as the case shows, he kept. This arrangement was made between the plaintiff and the superintendent of the Lehigh Company. The screenings were sold to the plaintiff, as shown by the weigh slips; the price did not appear thereon.

This course of dealing continued until some time in June, 1920; the defendant then began to collect four dollars and a half per ton, paying the Lehigh Company two dollars as before, and retaining two dollars and a half for hauling. As to what took place at this time in June the witnesses differ. One Rackleff, the superintendent of

the cold storage plant, testifies, "Mr. Morrison told me that the Lehigh was going to charge $3.50 for the coal and he would have to get $4.50—the price would be $3.50 for the coal and $1.00 a ton for hauling which would make it $4.50." He testifies further that he knew nothing to the contrary until in the latter part of October he received a bill from the Lehigh Company for a small amount of screenings billed at $2.00 per ton.

Mr. Black, the cashier of the plaintiff, testifies, "Sometime in June he (Morrison) came over with his slips same as he usually does to be paid, and I started to figure them up, and he says, 'You will have to add on $1.50 more because I have got to pay the Lehigh people $1.50 more.' I says, 'Does Mr. Rackleff know that?' He says, 'Yes.' I called Mr. Rackleff up to verify it, and he says, 'It is all right.'

Q. You paid from then on that basis? A. Yes."

Mr. Peightel, to whom the defendant applied for the job of hauling the screenings, testifies that some time in the beginning of the summer the defendant said that the Lehigh Company was going up on the screenings.

The defendant denies these statements in this way; he was asked by his counsel:

"Q. Did you at any time tell anyone the reason you went up to $4.50 a ton was because the Lehigh Valley had gone up on you? A. No, sir; they never went up on me."

He does not attempt to otherwise deny or to give his version of the conversations with Rackleff and Peightel.

His version of the conversation with Mr. Black is as follows:

"Q—Mr. Black has testified that when you called to get your money, you told him $4.50 a ton? A.—Yes; sir.

Q.—He paid you, and will you tell the court and jury what happened the first time you asked him for $4.50 a ton? A.—Why, I went in and passed him my bill, or my slips which they always paid me by, and I told him the screenings had gone up to $4.50 a ton. Any further conversation I don't remember. And he paid me my money there and then.

Q. Did he call up to inquire of anybody? A.—I don't know whether he did or not; I can't say."

He also testifies that he notified Mr. Christian, the treasurer of the company:

"Q.—What was the first thing you said to him? A.—The first thing I said to him—that I meant to have notified him before over the phone when I talked with him regarding the horse. I told him then screenings were going to be $4.50 commencing Monday morning. 'All right' he said. That is all there was to the conversation."

Mr. Christian positively denies that he had any such talk with the defendant; he says, "I had no dealings with Morrison."

If this case presented solely a question of credibility, of the weight to be given to the testimony, we might hesitate to interfere with the verdict, notwithstanding the number of witnesses stands three to one against it. As Mr. Justice Dunn aptly remarked in *Ladd* v. *Bean*, 117 Maine, 445, "Witnesses are to be judged not so much by numbers as by the weight of the evidence given by them. And the weight of the evidence depends upon its effect in inducing belief."

But the version given by the defendant of his statements to Mr. Black and Mr. Christian unmistakably carried the implication that the price of coal had advanced. "I told him (Black) the screenings had gone up to $4.50 a ton;" "I told him (Christian) screenings were going to be $4.50 commencing Monday morning," were his words according to his own version. Any person would understand that the increase was in the price of the screenings, not in the price of hauling. The defendant seems to have acted upon the idea, and his counsel has argued, that he was dealing in screenings, selling them to The Rundlett Company. Mr. Rackleff testified, "He said it was none of our business, if he bought coal for $3.00 a ton, whatever he got for it, no more than it was for us to buy fish at one price and sell it at another." The defendant himself testified:

"Q.—You weren't buying the coal in the beginning of the Lehigh Company? A.—From the Lehigh.

Q.—Not in the beginning? A.—I don't know what you really call it if I wasn't buying it from them; I got it from them.

Q.—You didn't buy the coal of Mr. Flaherty in the beginning? A.—That is the way I figured it—I was buying it. It was billed to the Rundlett Company on their slips."

This contention cannot be sustained upon the uncontroverted testimony. The coal was sold to The Rundlett Company upon its credit, charged to it, billed out to it, and the weigh slips read, "Sold to Rundlett Co."

In judging of the meaning which would be attributed to the defendant's version, it must be remembered that he had been employed by plaintiff for more than two years as one of its night force; that he had sought the opportunity to haul the screenings in his leisure hours at one dollar a ton, and was employed on that basis; he apparently had the confidence of his superiors who trusted him with the money to settle the weekly bills and did not ask him for the receipted bills.   He thus obtained money to which he was not entitled.   His contract was to haul coal screenings for one dollar per ton; if he would maintain his right to the money under another and different contract, the assent of the plaintiff to such other contract must clearly appear.   After the first employment no other contract for hauling is shown.

Upon the defendant's own testimony, corroborating the testimony of plaintiff's witnesses, the verdict is unmistakably wrong and should not stand.

It is contended, however, that the plaintiff has no standing to recover the money thus paid, because bills showing the price of the coal were sent daily from the Philadelphia office of the Lehigh Company to the plaintiff.   However that may be, knowledge of those bills is not brought home to the officials who dealt with Morrison, and is denied by them; none of them had charge of or received the mail.   "It is evident that mere negligence in making the mistake is not sufficient to preclude the plaintiff who made it from demanding its correction; for such negligence should not warrant the defendant in retaining the benefits of the mistake, unless his circumstances have been thereby so changed as to render it unjust and prejudicial to his legal interests."   *Sandy River Nat. Bank* v. *Miller*, 82 Maine, 137, 143.

It is also urged that after the commencement of the action and before filing of defendant's plea a receiver of the property of the plaintiff was appointed and the corporation enjoined from exercising any of its privileges or franchises.   Hence it is said that the present action cannot be maintained.   But the defendant pleaded the general issue, thus admitting the capacity of the plaintiff to sue. The action by the corporation did not abate upon the appointment of the receiver but may be continued for the benefit of the latter, and his name should be substituted by an order obtained on summary

application. R. S., Chap. 51, Sec. 84. Beach on Receivers. Alderson's Ed. Sec. 666. Alderson on Receivers, Sec. 534. *Talmage* v. *Pell*, 9 Paige, 410.

<div align="right">

*Motion sustained.*
*Verdict set aside.*
*New trial granted.*